We're ready for the first case this morning, which is case 17-6136, Bishop v. Szuba. Mr. Lankford, we're ready to hear you. May it please the Court, my name is John Lankford and I represent the defendant in this case, Robin Singleton Szuba. Before I forget, I would like to respectfully reserve some time for rebuttal. Time is yours. In this case, the district court misconstrued the facts and misapplied the law, which caused it to commit error on both prongs of its qualified immunity analysis. This appeal involves an investigation by the defendant into a foster home five months before the plaintiff was placed into that foster home by a different social worker. In conducting her investigation, she conducted several interviews, including interviewing the foster children who expressed no concern in the home at that time. She interviewed the social workers assigned to those children who expressed no concern at that time. She also interviewed the school nurse at the children's school who expressed no concern for abuse at that time. Finally, she also interviewed a third party whose daughter had overheard a rumor involving some impropriety by the foster home. But the plaintiff's expert determined or opined that this investigation didn't go far enough. When did she leave her employment? She left her employment in August 1999, right before the plaintiff was placed in the foster home. So this was how long after she had conducted the investigation? She conducted the investigation in March of 1999, so it was five months prior. All right. Thank you. Is she alleged to have had anything to do with the placement decision? No, Your Honor. In fact, as an investigator, her only role was to investigate referrals. The child, or the plaintiff in this case, had his own social worker, which was a different person, and the foster home was licensed, or not licensed, but inspected and approved by a different worker, a foster care specialist. The defendant's only role in this case was to conduct an investigation five months prior to the child's place there. She never met the child, exercised no custody or control over him. What is the deficiency in that investigation that is alleged, the particulars of that deficiency? Well, the plaintiff's expert appears to say, or opined, that it didn't go far enough, that she didn't conduct every possible interview. But I think the case law of this circuit is clear that failing to leave no stone unturned or failing to conduct an investigation just as another social worker would doesn't show a lack of professional judgment. In fact, it simply shows negligence. Well, to put a worst course fin on it, though, one of the people she didn't interview was somebody who reported seeing the porn on his computer, isn't that so? Well, it was the daughter of a person that overheard other people talking that there were some inappropriate sexual photos. I think the district court misconstrued that as showing that the foster parent was engaged in sexual activity with the children, but I don't think that's what it was. But at some point, though, I think she interviewed the mother of the person that heard the rumor, and that person indicated that it was just a rumor. But I think at some point it becomes speculative to say that even interviewing that person would have sussed out that abuse was occurring. She could have very well gone and interviewed that person and they said, well, I misunderstood it or that person was angry or whatever the case may be. But I think it's easier in hindsight to say that that's sort of the key to the whole thing when, at least in my opinion, she interviewed the person that brought the concern forward. Well, isn't the issue, though, in terms of whether this shocks the conscience of the court, whether it's her failure to investigate, to even follow up on that allegation, is so shocking? Because we don't know what she would have found out, unfortunately. We don't really know, do we, whether there were such photos? Right. I mean, I think that obviously cuts both ways on me there. But I think that because she interviewed the person that brought the allegation to light, she did an investigation, and I think... Well, and as I recall, and we've got another case on the dock involving Qualified Immunity today, but as I recall in this case, wasn't there a call to a hotline? Isn't that kind of what started this? A call to a hotline by the person she eventually interviews. Yes, Your Honor. And the caller said that she had heard that the foster parent's secretary had resigned her job because she had seen, I think the call was that she'd seen compromising photos of these children, and that she had quit her job because of it. It seems like a fairly definitive statement that would have been, presumably, pretty easy to follow up on by contacting the person who allegedly said it, which was the secretary that supposedly terminated. Well, I believe that what the facts demonstrated, though, was that she contacted the person that made that referral. That said her daughter had heard the secretary, sort of a triple hearsay thing. Right. And I'm not entirely sure, I mean, I apologize, I don't entirely remember that the person that was over her was even known to the daughter of the lady that made the referral. But does that matter? I mean, these are children's lives, and that's a serious allegation. It's a call to a hotline with some pretty specific information that could have presumably at least been followed up on, or some attempt could have been made. And you can't really dispute that had they found such photos, presumably he never would have been placed there. Well, I think that's true. I don't know, to the extent she could have found the photos, I think that's sort of beyond her power. I mean, they don't have... Why? Well, I mean, I don't know, I'm not saying beyond her power, but why would it have been beyond her power to try to track down the secretary? Well, tracking down the secretary, I think that's where she exercised her judgment. I think that from talking in person to the lady that made the referral and getting a I think that's where she exercised her judgment, that perhaps it was a case of, you know, bad feelings from a secretary that left the employee of the hospital. Well, she never talked to the secretary. I think this woman she talked to affirmed that she had heard this rumor through her daughter. At least that's the report that the social worker noted, is that she talked to this woman who confirmed, essentially, that this was a rumor that she'd heard from her daughter. There's nothing else to indicate it wasn't, there wasn't some validity to it. Well, I mean, I would... I guess I'm just asking, it's a significant, it's a significant hotline call. It's not some general statement that gets made that you can just kind of assume it never happened. It'd be easy enough to further investigate. Well, and I mean, I think that's true, but I think, again, it goes both ways. She investigated by interviewing that person. She talked to all the children. She talked to the social workers who would have been in that home more than she. I mean, I think, you know, I think that's sort of what can go in her favor in terms of exercising judgment. She made the best decision she could at the time. She had to... What is your best authority, your best case? As to... Best to your case. I mean, I think, as to her conduction of the investigation, I think it would be Johnson X. Rocano v. Holmes, and probably also Beard v. City of North Glen. Which hold? Beard v. City of North Glen holds that the failure, basically, the failure to leave no stone unturned is, I think, what the court called Batoken negligence. And I think that's sort of where I fall on that. I think, also, Kano-Holmes stands for the proposition that the failure to conduct an interview or an investigation, as well as some others may have liked, doesn't indicate an exercise, a lack of the exercise of professional judgment. So I think those would probably be my best two cases on that. And your weakness? Well, I mean, I guess my weakness would be, to Judge Moritz's point, that she didn't investigate, she didn't interview that one person. But, you know, I think that's sort of constrained by those two prior cases I mentioned. Thank you. It is important, I think, to note that, again, she didn't have any relationship with the child. She didn't place the child in the home. I think that this comes into play with regard to the special relationship doctrine. At some point, the district court's analysis becomes a little too vast to me. It sort of creates, in a way, an unending causal chain, almost like a chain of commerce in a product's liability case. All those responsible for that home to the time of abuse could be found liable. I think, in this case, there was, at least intervening circumstances, the plaintiff's expert opined that all social workers should have reviewed the facts and history of the home before placing children there. In fact, in this case, there was another investigation after the last one conducted by the defendant and another different foster worker made the decision, presumably after reviewing the evidence, to place the child there. I think that has to be, I think that creates an attenuated relationship. I don't know that, I wouldn't have any dispute that DHS has a special relationship with the to put that on a person that never met the child and did their work five months before the child was placed there. And I think, quickly, I think, I don't believe that in 1999 it was established that the failure to conduct a perfect investigation was established. The district court relied on a Schwartz v. Booker, a 2012 case, and indicated it stood for the proposition that an inadequate investigation was reasonably known to subject them to liability. But I think that's a misstatement of Schwartz v. Booker because I think Schwartz v. Booker stood for the proposition that the failure to conduct any investigation would be reasonably  And so I think those sum up the errors that the district court made, and I'd like to reserve the rest of my time for rebuttal. Mr. Peck. Mr. Court, my name is James Peck. I appear here today on behalf of the plaintiff, Applee, in reference to Mr. Lankford and his presentation. I think there's a couple of things that I would like to note at the outset about this to help set a framework for this case. In a 1983 action, pardon me if I speak too loud. I'm very loud. In my case, there is no such thing. I get that. In a 1983 action, one of the things it says is causes to be subjective. That's what the statute says, not just the subjection. This defendant has a specific role in this case that had she done it correctly, my client would not have been subjected to the action that he took. Well, I have some questions on that. Yes. First of all, I don't think you pointed us to any case where we extended liability back to an individual who conducted an investigation on a referral pre-placement and that never, the child was not in the home. I don't know about the fact that she never met the child, whether that matters, but the point is it was pre-placement. And I think you even acknowledge yourself that at the time of the placement, her notes about the investigation that she did, which you claim that investigation was lacking, were in the file. And presumably, whoever did that placement sure should have read her notes and seen what she did on that allegation and on that hotline tip. Why isn't it their problem if they didn't say, well, wait a minute, we had this tip. It wasn't followed up on. It's right here in the file. I mean, you are asking us to extend the link quite a ways down the line to a child who wasn't even in the home at the time she did the referral. And I don't know of any case law that permits that. I do not know of any case law either, Your Honor. The reason we point this out is the DHS is like a lot of institutions. There's a multiplicity of people who make decisions. It's a chain link deal, a chain deal. As you point out, the placement officer, placement employee, had the right to go back and look at all that. Well, they didn't just have the right. They should have. They should have. Well, they should have. And assuming for a moment that they did. And you haven't asserted any liability on the part of any other official who did the placement. Well, there were a multiplicity of defendants at the beginning of the case. All right. Okay. But I think part of the response to your query is, what would the placing officer look at other than what was in the file? So it kind of begs the question whether or not the file was adequately prepared. Was it done professionally? Was it prepared professionally? Because the workload there, the placement officer is not going to go back and redo the work that the other officer had done. Their workload is too high and they're going to do what they're going to do and may not have even had that authority. So it becomes imperative that what the defendant in this case did is done exactingly and correctly so that subsequent people had the right thing to rely upon. A simple example might be someone who prepares a map for a ship to go across the ocean. The captain of the ship is not going to go back and redo the cartographic work on it. They're going to rely on the map. So it needs to be correct. Well, I was clear from her note, at least the note that I read, and I don't think there's any other note in the file, it was clear from her note that the investigation, she said exactly who she interviewed, several different people, including the children, including the foster parent, including a school nurse, including social workers. And as far as this one particular allegation, she interviewed the person who had called the hotline. And she said, this is what this person said and that's it. So it's clear from the note. It's clear from anyone picking up that file that she did not follow up on that part. I mean, she may have questioned others about that. She may have, you know, whether that was going on. One thing I think that, at least from our perspective, that we look at is the very last sentence in the Bonnell where the court says that the placing people take the place of the parents. And I would assume that most parents, certainly in view of the fact that the DHS will be after you if you don't exercise your rights correctly and the DA will be after you if you fail, most parents would want to inquire as fully as possible so they'd call everyone and talk to everyone. This is a very serious allegation in regard to this person because he was eight years old. His parents' rights had been terminated. What separates your case? What moves this case from negligence to being actionable? Well, the specific thing is the conflicting testimony. We're talking about the summary judgment only. The conflicting testimony between the expert witnesses. The plaintiff's witness said that Ms. Zuba, the defendant here, abandoned her professional judgment. That's legal testimony. That isn't fact testimony. I agree, Your Honor, but she is the expert witness that went back and testified that reviewed the same notes and came up with the conclusion that would be hopefully admissible in a trial to go back and look at what Ms. Zuba did. There's no other way from a trial perspective to put that into the record except her testimony. So you're basically saying the reason we should reverse is because this is before us on summary judgment and there is a conflict of evidence, assuming that we disregard Judge McKay's point that this is not evidence but legal conclusions that preclude us from taking the matter to summary judgment at this point. Let me ask you this. Assuming that even that that is the case, don't we have to take one other step before we reverse on summary judgment and say that it is the missing evidence or this resolution of this conflict would somehow leave the case as an actionable case rather than as a case of pure negligence? That's where I'm hung up. If I understand your question correctly, Judge, is our position the case summary judgment was inappropriate here because there is a conflict and the conflict is not just... Because there is a conflict in the material evidence. What is the material evidence upon which there's a conflict? We'll give you that there's a conflict. There's always a conflict in evidence. Well, the very narrow specific question of whether or not there was professional negligence, and that is what the case law says. That's not the test. The test is abandonment and with a subset of shocks to the conscience. This isn't a negligence case and that's the problem. Sorry, I've interrupted you. This is my point. You presented for us two problems where of necessity we're going to have to draw lines that have never been drawn before. And one is the attenuation. I agree. And the other is how can we set a fair standard of what constitutes abandonment as opposed to negligence? And that talks about not exercising professional judgment. And the record at least shows that she did exercise some professional judgment. Is that true? I agree, Judge, that she clearly did exercise her professional judgment in this case. The question is whether or not it was adequate and sufficient. So we have to bear in mind that the compass we're dealing with is the language of abandonment, not the language of ordinary negligence tort. And we're also not dealing with a products liability case here. Again, we're talking about abandonment and shocks to conscience. I agree with you, Judge. That's well stated. The issue here is had she completely and fully done this examination the way that she could have done, would the result have occurred the way it did? Our position is that she abandoned it because in part her duty, as we note in the Yvonne L case, dealing with children, is one that she needs to, I think, professionally be very acute about what she does because there's no one else. Unlike a criminal case, every inmate supposedly is guilty when they become an inmate. These children have no culpability at all. The only protection they have is her professional judgment. It has to be... Not so quick. Isn't there a duty on the then current employees of the department to check up on this child? How do we know whether, in fact, this child would have complained to the employees of the social service department if they had been properly questioned, if the child had been properly supervised in her placement? It seems to me that you say this is the sine qua non of this case, and the only sine qua non is this mistake of not speaking to one of these witnesses. I agree with you, but here we're talking about one defendant. We're not talking about what the others may or may not have done. The question is, had this one defendant properly done her work, not abandoned any aspect of it, would that have been, in and of itself, sufficient to stop this process? We think it would be. It may be, you're correct, Your Honor, that some other potential worker in the case should have stepped in and done the same thing. I don't know that that is exculpatory to this defendant to say that some other defendant should have done something differently, and I agree they could have. The problem here is the nature of the crime, the nature of the offense, is one that is hidden. Well, this isn't a case where the employee receives a complaint and does nothing. It's a case where the employee receives a complaint and does a lot of things, but doesn't do one thing that may, and I underline and stress, may have led to the discovery of evidence that might have precluded the placement of this child. It seems to me that you just jumped to the conclusion that if she'd conducted further examination or further investigation, she would have discovered X and X would have been apparent to her. That is why the cases say that the conscience shocking is always evolving. Why should my conscience be shocked? I say this is a case of negligence for sure. I agree that it's negligence, but I think her failure to fully and completely adequately do this examination... This is a remarkable case. You have a child, and you have sexual exploitation. You have questions of pornography being hidden. It requires a high level of professional judgment. I mean, she's got a big task in front of her, and I think she pulled out too early and abandoned it. Well, she may have, and ultimately I think Judge Lucero's question should get us to that last prong we haven't really talked about, which is the clearly established prong. And the problem with the district court's opinion here is it looked at that from a very high level of generality, and as we know, we can't do that. And I wasn't able to come up with any cases where there'd been a fairly thorough investigation, but an incomplete investigation, arguably, as there was here. And I think that's what we would have to have, and I don't think you point us to any cases where the worker had done some investigation, but it was incomplete, and where that was a constitutional violation. Well... As opposed to, like, our recent case, Matthews, I think you might have done a 28J letter, where there was a complete failure to conduct an investigation on a referral. That's different. And if we're going to look at the particularized facts here, I think we need to hear about some case law where... Judge, I'm with you. There is no case. The Swartz case... Well, so how do we have... That's a motion to dismiss. How is the law clearly established, then? What do you rely on to say that the law was clearly established in 1999, that her conduct, this insufficient investigation, violated his constitutional rights? The question you asked earlier, Counsel, for the defendant here, is when you're confronted with the possibility that there may be another witness out there, and you're confronted with sexual exploitation of minor children, it's incumbent on her interprofessional capacity to fully develop the case and not pull off at any time. Well, I understand that that may be... And that may be relevant to whether we would find that this was a complete abdication of her professional responsibility or whether it shocks our conscience, but the next step would be, even if it did, was the law clearly established in 1999 that this would have been a constitutional violation? I understand the question you're asking. I'm unaware of any case that says she had that obligation, but if you look at it from the other side, it's very clear that the obligation existed to fully and completely protect these kids. I think there's professional responsibility... Generally, I think that's right. Everybody has degrees, and this is the highest degree of professional responsibility that we could find. I mean, not just advocating for my client, but what a terrible situation to be eight years old and be jerked out and thrown in the house, and people are going, so what? I did everything I could do. It didn't save him. None of that saved him. At the end of the day, in the absence of some kind of action where we said professional responsibility on her part has a high degree, then he's just left alone. And I think simply as this should be, the summary judgment was not appropriate. That's my time. Thank you, Counsel. We have a lot of cases this morning, so thank you for stopping right on time. You have about a minute or two remaining. May it please the Court, just briefly, there's no evidence produced that the file wasn't properly notated, and so in large measure, I think Counsel's captain-of-the-ship analogy is misplaced because it improperly places blame for the perceived failures of other persons upon the defendant. And I think I would just sum up by saying that I think Johnson, ex-row Cano v. Holmes, says that doubtless professionals may disagree on how to discharge their duties, but that does not create a lack of professional judgment. And I think that the position advocated by a plaintiff would reduce qualified immunity to a battle of experts. Doubtless, there may be, as Cano v. Holmes says, experts who disagree on the propriety of an investigation, but I don't think that's the inquiry. And so with that discretion being the better part of value, I'll end up here. Thank you. Thank you, Counsel, and thank you for yielding the remainder of your time. I will turn then. Before we turn to the next case, as you all leave the council table, I'm uncomfortable if people in the audience are uncomfortable, and I think we've had a lot of people standing, so let's do the best we can to make room for folks in the back of the courtroom who need a seat, please. Thank you, Your Honor. Thank you. Counsel are excused. Case is submitted. We're ready to turn to the next case.